UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DREW DEGROSKY,

    Plaintiff,

v.                                                                  Case No. 24-10673

HUB STADIUM OF FOUNTAIN                  Sean F. Cox
WALK AT NOVI, LLC, *et al.*,                       United States District Court Judge

    Defendants.
_____/

## OPINION & ORDER DENYING
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 15)

Following her termination from employment with Defendant HUB Stadium of Fountain Walk at Novi, LLC ("HUB"), Plaintiff filed suit against HUB and its manager, Gary Tenaglia, asserting pregnancy discrimination claims under both federal and state law. The matter is now before the Court on Defendant's Motion for Summary Judgment, filed after the completion of discovery. The parties have briefed the issues and the Court heard oral argument on April 3, 2025. For the reasons that follow, the Court DENIES Defendants' Motion for Summary Judgment and Plaintiff's claims shall proceed to a jury trial.

## BACKGROUND

On March 15, 2024, Plaintiff Drew DeGrosky ("Plaintiff") filed this lawsuit against Defendants HUB and Gary Tenaglia ("Tenaglia"). Plaintiff's original complaint is the operative complaint and it asserts pregnancy/sex discrimination claims under both Title VII, as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), and under Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq.* ("ELCRA").

1

Following the close of discovery, Defendants filed the instant Motion for Summary Judgment. This Court's practice guidelines are included in the Scheduling Order and provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

> a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.
>
> c. All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(Scheduling Order at 2-3).

In support of their motion, Defendants filed "Defendants' Statement of Material Facts Not In Dispute." (ECF No. 15 at PageID.61-70, "Defs.' Stmt."). In response, Plaintiff filed her "Counter-Statement" (ECF No 17, "Pl.'s Stmt.").

The relevant evidence submitted by the parties, *construed in the light most favorable to Plaintiff, the non-moving party*, is as follows.

Defendant HUB is a 70,000 square foot restaurant, bar, and active entertainment venue that features axe throwing, football bowling, curling, and other forms of entertainment. (Defs.' & Pl.'s Stmts. at ¶ 1). It is one of two such venues, the other one being located in Auburn Hills, Michigan. (Tenaglia Dep. at 10). Tenaglia originally had an ownership interest in one or both of the venues but testified that he sold the business to Brian Hussey ("Hussey"). Tenaglia testified

that he did so because he was charged and convicted of federal wire fraud offenses, which resulted in him being unable to run the business while he was in prison, and rendered him unable to hold a liquor license in his name following his felony conviction. (Tenaglia Dep. at 10-14).

Plaintiff and her husband were working and living in California before they went to work for HUB. Plaintiff's husband visited Michigan in May of 2022, and met with his step-uncle, Hussey. In early June of 2022, Plaintiff and her husband were offered jobs at HUB by Hussey. (Pl.'s Dep. at 68-70). Plaintiff was offered a sales job at HUB and her husband was offered a job as Director of Entertainment. (*Id*. at 72). The couple then moved from California to Michigan. (*Id*.).

HUB hired Plaintiff as a Sales Manager in August of 2022. (Defs.' & Pl.'s Stmts. at ¶ 3). Although Plaintiff had already started working at HUB on August 2, 2022, she was sent a written job offer on September 19, 2022, listing her salary at $62,400.00. (ECF No 15-7). The letter was signed by Tenaglia, who identified himself as the President of HUB. (*Id.*).

After she started working at HUB, Plaintiff reported directly to Ashley Sharma, HUB's Sales Director ("Sharma"). (Defs.' & Pl.'s Stmts. at ¶ 5). Sharma, in turn, reported to Tenaglia. (*Id*. at ¶ 6). Plaintiff regularly interacted with both Sharma and Tenaglia in performing her job at HUB.

As a Sales Manager, Plaintiff marketed, developed, planned, and sold private events and parties for HUB. (Defs.' & Pl.'s Stmts. at ¶ 7). Plaintiff's duties included "developing, planning and selling private parties, effectively managing the contract and working professionally with both front-of-house and back-of-house to ensure the event is carried out smoothly." (*Id*. at ¶ 8).

Plaintiff's hours of work at HUB depended on the scheduled events. (Defs.' & Pl.'s

Stmts. at ¶ 17).  Plaintiff typically worked at HUB Monday through Friday, from either 9:00 a.m. to 5:00 p.m or from 10:00 a.m to 6:00 p.m.  (*Id*. at ¶ 18).  Plaintiff also occasionally worked at HUB on the weekends, to set up for big events.  (Defs.' & Pl.'s Stmts. at ¶ 19).  Plaintiff regularly traversed HUB's entire space on a daily basis to accomplish her job duties.  (Defs.' & Pl.'s Stmts. at ¶ 12).  Plaintiff worked at the HUB Novi, Michigan location.  (Pl.'s Dep. at 90).

Plaintiff also worked outside of the HUB facility at various times, such as events wherein she worked to market HUB at outside or charity events.  (Pl.'s Dep. at 90-91).  Plaintiff "did not get paid more for the work she did after hours."  (Defs.' & Pl.'s Stmts. at ¶ 22).

Plaintiff also worked remotely at times, as did Sharma.  (*See* Pl.'s Ex. J, wherein Tenaglia authorized Sharma to work remotely one to two days per week).  Sharma testified that the nature of the job demanded that Plaintiff to do some work remotely:

> Q. Did she work a full-time schedule at Novi like you did?
> A. She did.  And she worked remotely as well. Because it just, the job demanded it. We were so busy . . . So we would be working 60, 70 hours. That included 20, 30 hours at home.
> Q. I want to clarify what you mean by that.  The job required you to work remotely, as you've described it, which was taking calls after you left, essentially for the day.
> A. Taking calls, answering emails, inquiries, incoming events that were going on that needed to be managed. The operations team would call us, yes.
> Q. But you agree with me that Drew's position when she started working on your sales team at Novi was a full-time in-person position and required additional work after hours remotely?
> A. Yes.

(Sharma Dep. at 31-32).

In mid-September of 2022, Plaintiff and her husband told Tenaglia and Hussey that Plaintiff was pregnant.  (Pl.'s Dep. at 111).  Very soon after that, on September 26, 2022, Plaintiff had an in-person meeting with Tenaglia, in one of the banquet rooms.  (Pl.'s Dep. at

4

107).  Plaintiff testified as follows regarding their conversation:

> Yes. So during this discussion on September 26th . . . Gary told me that he doesn't understand why people think that my husband is the successful one in the relationship, that he believes that I am the successful one in the relationship, and that my husband was not working to his standards in his position and so he would be taking away 25 grand out of his salary.
> During that time, he also mentioned to me that I was such a good employee that he was disappointed that, in a couple of months, he would have to find somebody to replace me when I had my baby.
> And then he said that he was going to give me a raise of $20,0000.

(Pl.'s Dep. at 108-09).  Plaintiff was very upset and cried in front of Tenaglia.  (*Id.*).  Tenaglia similarly testified that he expressed his disappointment to Plaintiff about losing her and that Plaintiff cried.  (Tenaglia Dep. at 34).

Later that same day, September 26, 2022, Tenaglia sent Plaintiff a text message on her cellular telephone saying "I would like to meet first thing tomorrow morning and continue our Discussion regarding sales.  Also, I'm sorry I caused you to cry."  (Pl.'s Ex. K).

Plaintiff testified that when she attempted to speak with Tenaglia the next morning, as he had requested, Tenaglia indicated he did not want to speak with her:

> And so I came in the next day, that was Tuesday, September 27th, and I walked into the room that Gary was in and said, "Hey, you wanted – do you have time to discuss, you know, your text?"
> And he lifted his hand up and said, "I don't want to talk to you."  And that is the last time Gary ever said anything to me.

(Pl.'s Dep. at 109; *see also* Pl.'s Dep. at 98, "Gary Tenaglia never spoke to me after the end of September 2022.").

Plaintiff advised her supervisor, Sharma, that she planned to take an eight to twelve week maternity leave and then return to work.  (Pl.'s Dep. at 34; Sharma Dep. at 40-41).  Sharma testified that she communicated that plan to Tenaglia and that he was good with that plan.

5

(Sharma Dep. at 40-41, 44, & 46-47).  Sharma also communicated that plan to HUB manager Sean Kilmon ("Kilmon").  (*Id.*).  At that time, there was not a set date as to when Plaintiff's maternity leave would start, but they knew the approximate time frame.  (*Id.*)

Plaintiff's due date was March 19, 2023.  (Pl.'s Dep. at 129).  Sharma testified that, sometime prior to March 2, 2023, she expressed concern to Tenaglia about his plan of installing a video camera in the sales office because it could be an issue with Plaintiff being exposed when breastfeeding, "[t]o which there was no concern" by Tenaglia.  (Sharma Dep. at 48).

On or about March 2, 2023, Plaintiff had a conversation with Sharma wherein Plaintiff relayed that it was becoming difficult for her to move around the facility, and inquired if she would be permitted to perform work remotely during her last two weeks of pregnancy, even if it was just part-time.  (Pl.'s Dep. at 126-28).

Sharma told Plaintiff that she would need to talk to Tenaglia about it.  (Pl.'s Dep. at 128; Sharma Dep. at 45).  Sharma then spoke with Tenaglia about Plaintiff's request, and stressed to him that they needed the help.  (Sharma Dep. at 48-50).  Sharma testified that Tenaglia approved Plaintiff being permitted to work part-time, up to 20 hours per week, on a remote basis for the last few weeks of her pregnancy.  (Sharma Dep. at 53-54).  Sharma communicated to Plaintiff that Tenaglia approved her request.  (Pl.'s Dep. at 130).

Plaintiff continued to work in-person at HUB, and Plaintiff and Sharma agreed that Wednesday, March 8, 2023, would probably be Plaintiff's last in-person day working at HUB before she began working remotely on a part-time basis until the baby was born.  (Pl.'s Dep. at 130-32 & 138; Sharma Dep. at 54-56).

Sharma testified that the events relating to Plaintiff that occurred on March 8, 2023 are

"something I'll never forget." (Sharma Dep. at 58). Katie McDonald became employed by HUB in an operational position at the beginning of March. (Sharma Dep. at 57). On March 8th, McDonald told Sharma that "Gary just told me that we have to let Drew go," and that Plaintiff was welcome to work until the end of that week but, after Friday Plaintiff would no longer be employed. (Sharma Dep. at 57-60).

Sharma testified that she was "very distraught," and tried to call Tenaglia because Plaintiff "was an exemplary employee. And I, there was no rhyme or reason to letting her go." (Sharma Dep. at 59). Sharma was stunned because "there was no reason for firing her." (*Id*.) Sharma tried speaking with HUB managers Kilmon and Hussey about the matter but they advised that it was "Gary's decision and there was no talking him out of it." (*Id*. at 61). Sharma was in tears, and upset, and told them "this is not okay." (*Id*. at 62).

HUB Marketing Director Emily Carpenter testified that, on March 8th, she was in the downstairs management office with Sharma and Kilmon when McDonald entered the downstairs management office and made the announcement that they were letting Plaintiff go, and "we were all in shock." (Carpenter Dep. at 37-38). Carpenter testified that she said this is "going to be a legal issue and it's discrimination and cannot [sic], like we literally cannot do this. And Katie [McDonald] said, I agree but this is what Gary wants." (*Id.* at 38). Kilmon responded that "he was used to Gary doing this kind of thing so he wasn't super surprised by it." (*Id*.).

At approximately 3:00 p.m. on March 8th, Plaintiff was working in her office when Sharma, who was visibly upset and had tears in her eyes, entered with Carpenter. (Pl.'s Dep. at 138). "And behind them came Katie [McDonald]" (*Id.*). McDonald advised Plaintiff that today was her last day of employment at HUB or, if she wanted to, she could work until Friday March

10th, if she needed the money. (Pl.'s Dep. at 138-39). McDonald told Plaintiff that Plaintiff would no longer have a position at HUB after she had her baby. (*Id.* at 139-140).

Sharma testified that she was crying at this time, as was Plaintiff. (Sharma Dep. at 69-70). She testified that McDonald was distraught but was not crying. (*Id.*).

Plaintiff understood that she had to decide whether to "pack up and leave that day or work until the Friday. Being visibly upset and hurt and extremely pregnant," Plaintiff "left that day." (Pl.'s Dep. at 139).

Sharma testified that Plaintiff was terminated, and that she was not simply being released for maternity leave. (Sharma Dep. at 60 & 62).

Sharma testified that, before Plaintiff left that day, Plaintiff "had to clean up her office. And Drew sat there and answered and replied to every single email so that she made sure that the team was set up for success," and Plaintiff "didn't even leave one thing in her inbox which, if I had just got fired, I would be storming out. But she cleaned up everything," and "made sure that the team was set," despite having been visibly upset and in tears. (Sharma Dep. at 65).

As Plaintiff left HUB that day, Plaintiff told the Curling Director that she was just fired. (Sharma Dep. at 71). Plaintiff acknowledges that she was upset and does not deny that she may have said "f this" (or words to that effect) as she left HUB. (Pl.'s Dep. at 142).

Later that day, Sharma spoke with Tenaglia and told him that she did not agree with the decision to fire Plaintiff, and there was no reason for it, and Tenaglia hung up on her. (Sharma Dep. at 72-74).

A week after Plaintiff's termination, on March 15, 2023, Sharma quit her job at HUB. (Sharma Dep. at 76). In her resignation letter, Sharma said she could "no longer associate

[her]self morally or ethically with this company" and that her resignation was effective immediately. (*Id.* at 77).

During the Equal Employment Opportunity Commission ("EEOC") investigation of Plaintiff's pregnancy discrimination complaint, Kathryn Tenaglia[1] submitted a sworn statement. (K. Tenaglia Dep. at 19-20). In it, Kathryn made several assertions, including that "[o]n March 6, 2023, [Plaintiff] approached our sales director, Ashley Sharma, that this would be her last week in the office and wanted to work remotely until the baby was born and continue to work remotely for the next six months." (*Id.* at 26). Her statement also asserted that Plaintiff had been offered an unpaid leave of absence. (*Id.* at 28-29).

After receiving her "right to sue letter" from the EEOC, Plaintiff filed this action against Defendants.

## ANALYSIS

**I.    Defendants' Challenge To Title VII Claim Against Defendant Tenaglia Is Moot Because Plaintiff Does Not Assert Such A Claim.**

In their motion, Defendants assert that Plaintiff cannot assert a Title VII pregnancy-discrimination claim against Tenaglia because Title VII does not provide for individual liability. (Defs.' Br. at 23-24). It is true that individuals, who do not otherwise qualify as an "employer," cannot be held personally liable for violations of Title VII. *Griffin v. Finkbeiner*, 689 F.3d 584, 600 (6th Cir. 2012).

In response to the pending motion, Plaintiff's brief states that her "complaint makes clear" that her Title VII claim "applies to Defendant HUB, only." (Pl.'s Br. at 25).

---

[1] Kathyrn Tenaglia, Gary Tenaglia's ex-wife, works in Human Resources at HUB. (K. Tenaglia Dep. at 6-10).

9

Plaintiff is correct that her Complaint asserts her Title VII claim against HUB alone. (*See* ECF No. 1 at PageID.5) (Asserting her Title VII claim "(against Defendant HUB)." The Court denies this challenge as moot, given that Plaintiff has not asserted her Title VII claim in this action against Defendant Tenaglia.

## II. The Pregnancy Discrimination Claims Plaintiff Does Assert In This Action Survive Summary Judgment And Shall Proceed To A Jury Trial.

The claims that Plaintiff does assert in this action are pregnancy/sex discrimination claims against HUB alone under Title VII and pregnancy/sex discrimination claims against both HUB and Tenaglia under the ELCRA.

"Under the Pregnancy Discrimination Act provisions of Title VII, discrimination because of or on the basis of pregnancy, childbirth, or related medical conditions is defined as a kind of sex discrimination and is prohibited. 42 U.S.C. § 2000e(k). Women who are affected by pregnancy, childbirth or related medical conditions are required to be treated the same, for all employment purposes, as other persons not so affected but who are similar in their ability or inability to work." *Tysinger v. Police Dep't of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006). Michigan's ELCRA similarly prohibits sex discrimination, including due to pregnancy, child birth, or a related medical condition. Mich. Comp. Laws § 37.2201(d). As both parties acknowledge in their briefs, the federal and state pregnancy discrimination claims are evaluated generally under the same standards.

At the summary judgment stage, a plaintiff can support her discrimination claims using either direct or indirect evidence of discrimination. *Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 570 (6th Cir. 2003). It is well-established that "[t]he direct evidence and circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the

10

other, not both." *Kline v. Tennessee Valley Authority*, 128 F.3d 337, 348-49 (6th Cir. 1997).

Here, in responding to the pending motion, Plaintiff contends that she can survive summary judgment under both approaches.

The Court need not consider Plaintiff's arguments concerning direct evidence, because the Court concludes that Plaintiff survives summary judgment under the circumstantial evidence approach.

When a plaintiff relies on indirect evidence to show discrimination, the familiar *McDonnell Douglas* burden-shifting framework applies. Under that framework, the employee bears an initial burden of making out a prima facie case of discrimination. If she can do so, the employer must provide a legitimate, non-discriminatory basis for the termination. If the defendant does so, the burden shifts back to the plaintiff to show that the proffered reason is merely a pretext for unlawful discrimination. *Kubik v. Central Mich. Univ. Bd. of Trustees*, 717 F. App'x 577, 581 (6th Cir. 2017).

### A. Prima Facie Case Of Pregnancy Discrimination

To establish a prima facie case of unlawful pregnancy discrimination, a plaintiff must establish: 1) she was pregnant; 2) she was qualified for her job; 3) she was subjected to an adverse employment decision; and 4) there is a nexus between her pregnancy and the adverse employment action. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000); *Kubik v. Central Mich. Univ. Bd. of Trustees*, 717 F. App'x at 581.

For purposes of the pending motion, Defendants challenge only the second and fourth elements. (*See* Defs.' Br. at 13). That is, for purposes of this motion, Defendants do not dispute that Plaintiff was pregnant or that she was terminated from her job at HUB.

### 1. Qualified For Her Job

Under Title VII, "[i]n order to be 'qualified' for her position," Plaintiff "must demonstrate that she was meeting her employer's legitimate expectations and was performing to her employer's satisfaction." *Warfield v. Lebanon Corr. Inst.*, 181 F.3d 723, 729 (6th Cir. 1999). Similarly, under the ELCRA, an "employee is qualified if [s]he was performing [her] job at a level that met [her] employer's legitimate expectations." *Cicero v. Borg–Warner Auto., Inc.*, 280 F.3d 579, 585 (6th Cir.2002) (quoting *Town v. Mich. Bell Tel. Co.*, 568 N.W.2d 64, 69 (Mich. 1997)).

The Court must evaluate whether a plaintiff established his or her qualification "independent of the employer's proffered non-discriminatory reasons for discharge." *Cicero,* 280 F.3d at 585. That is, "when assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660–61 (6th Cir. 2000); *see also DeBoer v. Musashi Auto. Parts, Inc.*, 124 F. App'x 387, 391 (6th Cir. 2005) (The "proffered reason for the adverse employment decision itself cannot be counted against other evidence of job qualification" at the prima facie stage.).

In challenging Plaintiff's ability to meet this element Defendants make entirely misplaced arguments, directing the Court to ADA failure-to-accommodate cases, and making arguments that ignore the above directive to consider the plaintiff's evidence independent of the alleged nondiscriminatory reason for termination.

Plaintiff has directed the Court to more than sufficient evidence that, construed in her

favor, establishes she was qualified for her position as Sales Manager such that she can meet this second element of a prima facie case.

Plaintiff holds a Bachelor of Science degree, having graduated with honors from Arizona State University, and had sales experience prior coming to work for HUB. (Pl.'s Ex. A). Plaintiff began working at HUB on August 2, 2022, and reported to Sharma. Sharma testified that Plaintiff was "an exemplary employee." (Sharma Dep. at 59).

Tenaglia testified that he also found Plaintiff to be an "exemplary employee," and that he was aware that her direct supervisor did so too:

> Q. . . . you felt that Drew was an exemplary employee, fair?
> A. Yeah, I did.
> Q. All right. And did Ashley Sharma, to your knowledge, feel the same way?
> A. Yeah, I think she spoke very highly of her.

(Tenaglia Dep. at 49-50). Tenaglia further testified that Plaintiff was hardworking, conscientious, and personable. (Tenaglia Dep. at 25-26). Tenaglia testified that he "was always complimentary of [Plaintiff's] efforts and her work ethic. There was no question about that." (*Id.* at 45). Tenaglia testified that Plaintiff was an honest person and was good with customers, and that Plaintiff did a good job in terms of booking parties for events at HUB. (*Id.*). Tenaglia considered Plaintiff "an asset," and after less than two months in her role as Sales Manager, Tenaglia gave Plaintiff a $20,000.00 raise. (Tenaglia Dep. at 26; *see also* Tenaglia Dep. at 29) ("she was doing a good job. I – I offered my appreciation for her hard work and, as such, increased her compensation" and told Plaintiff "I considered her an asset.").

An employer would generally not give an employee a salary raise unless that employee was satisfying the employer's performance expectations. Thus, evidence of an employee having been given a raise or bonus is construed as strong evidence that the employee was qualified for

his or her position. *See, eg., Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 586-87 (6th Cir. 2002); *Hussain v. Highgate Hotels, Inc.*, 126 F. App'x 256, 264 (6th Cir. 2005) (Explaining that "an employee's receipt of performance bonuses" alone generally creates "at least a question of fact that the employee was meeting his employer's legitimate expectations.").

### 2. Nexus Between Pregnancy And Adverse Action

As the third element of a prima facie case of pregnancy discrimination, Plaintiff must establish that there is a nexus between her pregnancy and the adverse action. *Kubik,* 717 F. App'x at 581. This nexus requires some connection between Plaintiff's pregnancy and her termination. *Id.*

As explained in *Kubik,* "where an adverse action occurs soon after pregnancy, courts can infer a nexus from the temporal proximity." *Kubik*, 717 F. App'x at 582. Temporal proximity of two months between the employer learning of an employee's pregnancy and that employee's termination has been held, standing alone, to be sufficient to establish the required nexus for purposes of a prima facie case of pregnancy discrimination. *See Asmo v. Keane, Inc.*, 471 F.3d 588, 594 (6th Cir. 2006).

In *Kubik*, there was a gap of five months between the end of the plaintiff's pregnancy and the adverse action. *Id*. at 581. The Sixth Circuit found that temporal proximity alone was insufficient to establish the nexus element, explaining:

> The gap between the end of Kubik's pregnancy and the first vote against her reappointment was only five months. We do not think that a gap of five months presents an insuperable bar for a plaintiff alleging pregnancy discrimination, but we do not see sufficient evidence to support such a claim here. When we have looked to a time gap for evidence of discrimination, we have looked for a gap shorter than the five months between the conclusion of Kubik's pregnancy and the first vote not to recommend her reappointment. *See, e.g., Asmo v. Keane, Inc.*, 471 F.3d 588, 594 (6th Cir. 2006). But that does not mean that a five-month gap

> precludes relief; it simply means instead that additional evidence must be offered. That is why our pregnancy-specific test is better suited to such cases: it looks for "a nexus between [the] pregnancy and the adverse employment decision," *Cline*, 206 F.3d at 658, rather than setting an arbitrary cut-off that would allow an employer who wishes to fire an employee for her pregnancy simply to outlast the requisite waiting period.

*Id*. Thus, the plaintiff had to offer some other evidence in addition to the temporal proximity. *Id*. "For example, other evidence can come in the form of comments, *see, e.g., Figgins v. Advance Am. Cash Advance Centers of Mich., Inc*., 476 F.Supp.2d 675, 691–92 (E.D. Mich. 2007)." *Id*. Such other evidence can also consist of an employer's conduct after a pregnancy announcement.

In *Figgins*, comments about the plaintiff's pregnancy were made, such as "With your weight and your age being pregnant, you're going to end up being off work all the time," and a supervisor complaining "that the plaintiff's pregnancy was inconvenient because it would require the plaintiff to be out of the office." *Figgins, supra,* at 690-91. The district court concluded that while those comments did not constitute direct evidence, it was evidence that supported an inference of discrimination based on the plaintiff's pregnancy and that the nexus element was met. *Id*.

Here, Defendants assert that Plaintiff cannot establish the nexus element because more than six months lapsed between the disclosure of Plaintiff's pregnancy and her termination. (Defs.' Br. at 19). Defendants contend that temporal proximity alone is insufficient to establish this element, and that Plaintiff has no other evidence to satisfy this element.

Plaintiff, however, does not rely on temporal proximity alone to establish the nexus element in this case. There is additional evidence that supports an inference of pregnancy discrimination. This includes Tenaglia's comments to Plaintiff after she announced her

15

pregnancy – that Tenaglia was disappointed that he would have to replace her. It also includes Tenaglia's conduct after learning about Plaintiff's pregnancy, including his emailing her to continue their discussion the next day, only to hold up his hand and say, "I don't want to talk to you," and then Tenaglia having stopped talking to Plaintiff at work. It also includes Tenaglia having approved Plaintiff for part-time remote work during the last few weeks of her pregnancy, but then changing course and instructing that Plaintiff be fired on her last day in the office. There is more than enough other evidence to satisfy the nexus element of a prima facie case of pregnancy discrimination.

**B.     Pretext**

Defendants identify "Plaintiff's inability to satisfy the essential functions of her position of full-time, in person attendance" as the legitimate and non-discriminatory reason for terminating Plaintiff. (Defs.' Br. at 22).

A plaintiff can refute the legitimate, nondiscriminatory reason that a defendant offers to justify an adverse action by showing that the proffered reason: 1) had no basis in fact; 2) did not actually motivate the defendant's challenged conduct; or 3) was insufficient to warrant the challenged conduct. *Wexler v. White Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003). The first type of showing consists of evidence that the proffered bases for the termination never happened (*i.e.,* that they are factually false). With respect to the second kind of showing, "the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). The third showing consists of evidence that other employees, particularly those not in the protected class, were not fired

16

even though they engaged in similar conduct. *Id*.

As the Sixth Circuit has explained, "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not? This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

At the summary judgment stage, a plaintiff seeking to prove discrimination via indirect evidence must submit sufficient evidence from which a reasonable jury could conclude that the defendant's nondiscriminatory reason for the challenged action is a pretext for unlawful discrimination. *Vincent v. Brewer*, 514 F.3d 489, 494 (6th Cir. 2007).

Construing the evidence in the light most favorable to Plaintiff, there is sufficient evidence from which a reasonable jury could conclude that Defendant's stated reason for terminating Plaintiff is a pretext for unlawful pregnancy discrimination. This evidence includes the following.

"Pregnancies are usually met with congratulatory words, even in professional settings." *Asmo v. Keane*, 471 F.3d 588, 594 (6th Cir. 2006). Here, however, after Plaintiff advised that she was pregnant, Tenaglia expressed his disappointment and stated that he would have to find someone to replace Plaintiff when she had the baby, causing Plaintiff to cry. Tenaglia then emailed Plaintiff to continue their discussion the next day, only to hold up his hand and say, "I don't want to talk to you." Tenaglia, who managed the HUB location where Plaintiff worked and regularly interacted with her prior to her pregnancy announcement, then stopped speaking to Plaintiff.

Although Tenaglia had approved Plaintiff for part-time remote work during the last few

17

weeks of her pregnancy, he then changed course and instructed that Plaintiff be fired on her last day working in person in the office – just eleven days prior to her due date.

And the circumstances surrounding Plaintiff's termination lend further weight towards Plaintiff's argument that she was discriminated against because of her pregnancy. This includes that Tenaglia did not have Plaintiff's direct supervisor (Sharma) terminate Plaintiff, or even apprise Sharma that Plaintiff was going to be terminated. Rather, Tenaglia instructed a new employee (McDonald) to terminate Plaintiff.

In addition, Plaintiff's direct supervisor (Sharma) thought Plaintiff was doing a great job and was an "exemplary employee," as did Tenaglia. Sharma testified that she approved Plaintiff to work remotely part-time during the final weeks of her pregnancy (with Tenaglia's approval), and that Sharma believed there was "no reason" to fire Plaintiff. Sharma testified that she spoke with Kilmon and Hussey about it as soon as she learned Plaintiff was going to be fired, and tried to stop it, and told them that Plaintiff's termination "is not okay." Moreover, Sharma was not the only manager at HUB who expressed surprise and disapproval about Tenaglia's decision to terminate Plaintiff. Indeed, in a room with several HUB managers present, Emily Carpenter stated aloud this is "going to be a legal issue and it's discrimination" and "like we literally cannot do this." (Carpenter Dep. at 38). McDonald stated "I agree but this is what Gary wants," and Kilmon responded that "he was used to Gary doing this kind of thing so he wasn't super surprised." (*Id.*).

As Plaintiff notes in her brief, Defendant has also provided shifting explanations for Plaintiff's termination, including assertions by Kathryn Tenaglia, that Defendants have since abandoned, that Plaintiff had asked to work remotely for six months after the baby was born, and

18

that Plaintiff had been offered an unpaid leave of absence but refused it. That is also evidence that can establish pretext. *Asmo*, 471 F.3d at 596 (An employer's changing rationale for making an adverse employment decision can be evidence of pretext).

Accordingly, the Court denies Defendants' Motion for Summary Judgment and Plaintiff's claims shall proceed to a jury trial.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Defendants' Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.


Dated: April 4, 2025             s/Sean F. Cox
                                 Sean F. Cox
                                 United States District Court Judge

I hereby certify that on April 4, 2025, the document above was served on counsel and/or the parties of record via electronic means and/or First Class Mail.

                                 s/Emily Vradenburg
                                 Case Manager